**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHOSHANA AKINS, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 22-_____ |
| | : | |
| CITY OF PHILADELPHIA; JOSEPH | : | JURY TRIAL DEMANDED |
| BOLOGNA; JOHN DOES 1-5, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**COMPLAINT**

**I.     INTRODUCTION**

1.      On June 1, 2020, during a peaceful protest against police brutality, Joseph Bologna, a high-ranking staff inspector with the Philadelphia Police Department, alongside several other officers, arrested Shoshana Akins without justification and violently assaulted her in the process. Defendant Bologna, or an officer under his supervision, placed zip-ties on Ms. Akins's wrists so tightly that her circulation was cut off and then Bologna proceeded to twist each of her fingers to the point of nearly breaking them, causing her long-term pain, numbness, and permanent nerve damage.

2.      At defendant Bologna's direction, several other PPD officers then arrested and detained Ms. Akins without probable cause that she had committed any crime.

3.      Defendants Bologna and John Does 1-5 acted with impunity when they violently retaliated against Ms. Akins for engaging in protected political expression. At the time, Ms. Akins was participating in a demonstration against police violence, part of a widespread,

international response to the police killing of George Floyd in Minneapolis, Minnesota a few days earlier.

4.     The conduct of defendants Bologna and John Does 1-5 and the harms Ms. Akins suffered are a direct result of the actions and inactions of City of Philadelphia policymakers. For years prior to his assault on Ms. Akins, defendant Bologna had a significant history of unlawful and abusive police practices, including the frequent use of unnecessary violence and excessive force. However, rather than being disciplined or terminated from his position as a police officer, he continually received promotions and was allowed to rise through the ranks of the Philadelphia Police Department ("PPD") and supervise other officers.

5.     In addition to the failure to prevent defendant Bologna specifically from committing further acts of state-sanctioned violence, the City has established a longstanding practice of aggressively suppressing peaceful political protest. This custom resulted in the assault and arrest of Ms. Akins when she attempted to participate in one such demonstration. In late-May and early-June 2020 specifically, the City made a deliberate choice to abandon its previously developed operational plans to facilitate the safety of those engaged in political demonstrations in favor of its historical practice of violently subduing such protest and encouraging its officers and supervisors—including Bologna—to do so with the use of unjustified physical force and mass, unwarranted arrests.

6.     As a result of defendants Bologna and John Does 1-5's conduct and the City's affirmative decisions, Ms. Akins suffered substantial harms and losses, including physical pain and suffering, emotional trauma, and loss of liberty. Ms. Akins brings this action asserting claims under 42 U.S.C. § 1983 to hold defendants accountable for these violations of her civil rights.

## II.     JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

8.     This Court is the proper venue pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in the Eastern District of Pennsylvania.

## III.    PARTIES

9.     Plaintiff Shoshana Akins is a 33-year-old city planner, public health worker, and resident of Philadelphia, Pennsylvania.

10.     Defendant City of Philadelphia ("Philadelphia" or the "City") is a municipality in the Commonwealth of Pennsylvania that owns, operates, manages, directs, and controls the Philadelphia Police Department ("PPD"). The City is responsible for enforcing the rules and directives of the PPD and ensuring that PPD personnel obey the laws of the United States and the Commonwealth of Philadelphia.

11.     Defendant Joseph Bologna was, at all times relevant to this Complaint, a staff inspector in the Philadelphia Police Department. He is sued in his individual capacity.

12.     Defendants John Does 1-5 were at all times relevant to this Complaint police officers employed by the City of Philadelphia who acted under the direction of the City of Philadelphia. They are sued in their individual capacities. The identities of these defendants are not presently known, and plaintiffs will amend this Complaint to properly name all defendants after preliminary discovery.

13.     At all times relevant to this Complaint, all defendants acted under color of state law and in concert and conspiracy. All defendants are jointly and severally responsible for the harms caused to plaintiffs.

IV.    FACTS

    A.    **Protest in Philadelphia Following the Murder of George Floyd**

14.    On May 25, 2020, George Floyd, an unarmed Black man, was killed in Minneapolis, Minnesota by a police officer who kneeled on his neck for almost nine minutes until his death. Several other officers watched while this killing occurred, as Mr. Floyd told the officers that he could not breathe and pleaded for his life.

15.    In the days and weeks following the police killing of Mr. Floyd, people across the United States and the world gathered to protest his death and the larger pattern of police violence against Black people. Protesters focused on the recent killings of Breonna Taylor and Mr. Floyd, and also drew attention to the countless other Black people who have been killed by police officers, the disparate treatment Black people experience in interactions with police, and the disproportionate funding allocated to police departments compared to other city services in municipalities across the country.

16.    In Philadelphia, thousands of people, including plaintiff, joined in the movement to protest police brutality following Mr. Floyd's death. These protests lasted for weeks and many Philadelphians, including Ms. Akins, participated in multiple days of demonstrations.

17.    Philadelphia police responded to these peaceful and lawful protests with extreme force, pervasive use of chemical weapons, and mass arrests.

    B.    **The June 1 Assault and Unlawful Arrest of Shoshana Akins**

18.    On June 1, 2020, Ms. Akins decided to attend an organized demonstration in Center City, Philadelphia to protest police brutality. She had attended peaceful gatherings the prior two days which had culminated in aggressive and violent police responses. On May 31, the

day before, Ms. Akins witnessed the teargassing of 52nd Street in West Philadelphia and helped victims of the police violence obtain medical care.

19.     Because of the level of organization, the reputable community groups involved, and the location of the June 1 protest, Ms. Akins believed that this event would be less prone to police aggression. She erroneously assumed that after two days of unrestrained hostility on the part of the police, the City would have the PPD's response under control.

20.     The peaceful march began at North 8th and Race Streets and proceeded past City Hall before turning north on Broad Street. Ms. Akins was biking toward the back of the marchers. Behind Ms. Akins were a line of police cars and numerous police officers on bicycles.

21.     Defendant Bologna was serving as the supervisor of the unit of police officers on bicycles.

22.     Around the intersection of Broad Street and John F. Kennedy Boulevard, Ms. Akins noticed that a police car trailing the march, operated by Philadelphia police officer John Doe 1, was getting very close to the protesters, within about two feet of the people at the rear of the march. In an effort to create some more distance between the car and the pedestrian protesters and ensure their safety, Ms. Akins fell to the back of the march and started biking more slowly.

23.     None of the police officers present gave Ms. Akins or other protesters an order to disperse or a warning that she would be arrested.

24.     Defendant officer John Doe 1, instead of also slowing down, quickly drove around Ms. Akins's bike so that she was separated from the other protesters. As she attempted to bike around the passenger side of the police car to rejoin the march, she heard defendant John Doe 1 direct the bike officers to "get her."

25.     Defendant officers John Does 2-5 then began to close in on Ms. Akins surrounding her from all sides. Two officers rode their bikes into Ms. Akins's bike, stopping it. Two other officers then pulled her off her bike from behind. They dragged her from the center of the street where she had been riding, onto the sidewalk.

26.     Ms. Akins's phone flew out of her hand and an officer ripped her backpack off her back, pouring its contents onto the street. They tore up the packaged food items she had brought with her to the demonstration.

27.     Approximately 20 police officers surrounded Ms. Akins. She tried to remain calm while numerous officers attempted to grab her arms and restrain them behind her back. She was completely isolated from other protesters at that time and could only see law enforcement officers.

28.     Defendant John Doe 2 placed plastic zip-tie handcuffs over her wrists and fastened them extremely tightly.

29.     While the other officers were restraining her, Ms. Akins could hear defendant Bologna from behind her yelling at the officers to hurry up.

30.     Defendant Bologna then rode up behind Ms. Akins and grabbed her wrists himself. He either tightened the zip-ties further, or in the alternative, saw how tight they were and did not loosen them.

31.     At this time, Ms. Akins was already restrained and surrounded by police officers. She was not resisting arrest or posing a threat to herself or others.

32.     Defendant Bologna then proceeded to methodically twist Ms. Akins's fingers one-by-one, causing her extreme pain and fear that he was going to break them.

33.     While assaulting her, defendant Bologna whispered in Ms. Akins's ear and attempted to intimidate her verbally by insulting her with profanity.

34.     After injuring her fingers, defendant Bologna directed other officers to put Ms. Akins in a police van with two other protesters.

35.     Due to a prior injury, Ms. Akins had experience with wrist nerve harm. She could feel that the zip-ties were causing damage and that she only had a certain amount of time to remove them before the nerve damage would become very serious.

36.     Ms. Akins asked the other two detained women in the police van to look at her hands because she was in severe pain but could not see her injuries as her hands were still restrained behind her body. The other women were immediately concerned and told Ms. Akins that her hands had turned purple.

37.     The two other detained women began banging and kicking on the door of the police van, begging officers to help Ms. Akins. When Ms. Akins was able to show the officers her hands, they immediately saw that there was a problem and attempted to remove the too-tight zip-ties.

38.     The zip-ties were so tightly fastened that the loosening mechanism was inaccessible and the police could only get them off by cutting them off with a knife that they borrowed from passing officer. It took several officers and attempts to get them off.

39.     Defendant Bologna then yelled at the other officers to hurry up and move the van, directing them to take Ms. Akins and the other two women away.

40.     Ms. Akins was then transported to the PPD precinct at 17th Street and Montgomery Avenue where five unmasked police officers asked her and other detainees

questions and berated them for not answering. After about an hour or two, she was released with a citation for failure to disperse.

41.    On July 8, 2020, following a significant public outcry in response to the City and the PPD's mishandling of the summer's constitutionally protected protest activity, Philadelphia Mayor Jim Kenney ordered the dismissal of all protest-related citations issued between May 30 and June 30, 2020, including Ms. Akins's.

42.    After being forced to leave it in the street upon her arrest, Ms. Akins was never able to find her custom bicycle again. Police told her they did not have it and could not help her recover it.

**C.    Aftermath of Ms. Akins's Assault and Unlawful Arrest**

43.    Ms. Akins sustained significant nerve damage as a result of the constricting zip-ties and defendant Bologna's manipulation of her fingers while she was restrained.

44.    She attempted to return to work after the assault but it was too painful for her to type on a computer for a sustained amount of time. She was put on medical leave from June through September 2020.

45.    In mid-June, 2020, Ms. Akins was able to see a medical professional who recommended that she rest her wrist and fingers and start physical therapy to rehabilitate the injury.

46.    Almost two years later, Ms. Akins still experiences nerve pain and numbness in her wrist.

47.    Ms. Akins also experienced psychological consequences of her assault and unlawful arrest, including feelings of anxiety, fear, and increased distrust of law enforcement.

48.    On the one-year anniversary of the assault, Ms. Akins started to have panic

attacks related to the assault and began seeing a mental health professional to address the trauma

she had sustained.

D.    **The City of Philadelphia's Responsibility for Ms. Akins's Harms and Losses**

49.    The unlawful conduct of defendants Bologna and John Does 1-5 and the harms

suffered by Ms. Akins are directly attributable to the affirmative decisions by policymakers of

the City of Philadelphia and the failures to act on the part of those policymakers with deliberate

indifference to the risk that such failures would lead to the violations of civilians' constitutional

rights.

i.    **The Failure to Train, Supervise, and Discipline Defendant Bologna**

50.    For years prior to the June 1, 2020, assault of Ms. Akins, the City was aware of an

alarming pattern of misconduct and brutality by defendant Bologna.

51.    Despite this knowledge, instead of properly disciplining him, the City

continually promoted Bologna, explicitly approving his misconduct and granting him further

opportunities to supervise fellow officers and violate civilians' constitutional rights.

52.    Bologna's history of misconduct was well documented in both newspaper articles

and civil complaints.

53.    On August 22, 2009, The Philadelphia Inquirer published an article regarding

illegal raids on convenience stores performed by a unit of four PPD narcotics officers working

under Bologna's supervision.[1]   The article described surveillance video footage showing

---

[1] Wendy Ruderman and Barbara Laker, *Video sharpens focus on raid*, THE PHILADELPHIA INQUIRER (August 22, 2009), *available at*, https://www.inquirer.com/philly/news/special_packages/20090330_Video_sharpens_focus_on_raid.html (last accessed May 13, 2022).

Bologna directing officers to cut the cords supplying power to the store's surveillance camera system.  Then PPD Commissioner Charles Ramsey stated that he could not think of any official reason for police officers to cut camera wires.  After this reporting, people connected with at least five other convenience stores reported that Bologna's unit had cut cords to their surveillance cameras and/or stole money and merchandise.

54.     Additionally, on April 24, 2014, The Philadelphia Inquirer published an article regarding Bologna and the same four officers under his command.[2] According to then Commissioner Ramsey, PPD's Internal Affairs Division, which is responsible for investigating allegations of officer misconduct, sustained several allegations of wrongdoing.  In particular, Bologna, was found to have failed to properly supervise Officer Richard Cujdik as he was present when Cujdik improperly searched a car without a warrant. As stated in the article, the City settled 33 lawsuits for a total of $1.7 million related to misconduct by Bologna and the officers he supervised.

55.     Some of the lawsuits referenced in the Inquirer's reporting and involving misconduct by Bologna acting in a supervisory capacity include the following facts:

    a.  Plaintiffs Joseph and Tamara Marcolongo, in civil action No. 09-cv-3554, alleged that Bologna and his fellow officers entered their home, punched Mr. Marcolongo in the face, took money from the plaintiffs (including $80 from a child's piggybank), and falsely claimed that they found illegal narcotics.

---

[2] Mike Newall and Aubrey Whelan, *No criminal charges for four Philly officers in 'Tainted Justice' Cases*, THE PHILADELPHIA INQUIRER (April 24, 2014), *available at*, https://www.inquirer.com/philly/news/20140425_No_criminal_charges_for_narcotics_officers_in__Tainted_Justice__series.html (last accessed May 13, 2022).

b.  Plaintiffs Juan Collado-Gomez and Josephina Fortuna, in civil action No. 09-cv-03911, alleged that Bologna and officers under his command raided his convenience store; restrained him and an employee; cut wires for all surveillance cameras in the store; took money from the cash register, from Mr. Collado-Gomez's person, and his apartment directly above the store; stole cigarettes and other items from the store; and prepared a false affidavit of probable cause to justify their illegal actions.

c.  Plaintiff Antonio Lanzara, in civil action No. 09-cv-4071, alleged that officers working under Bologna's supervision prepared a false affidavit of probable cause to justify the search of his property and, further, that a confidential informant who purportedly gave information concerning alleged criminal activity by Mr. Lanzara has been paid large sums of money by an officer working under Bologna.

d.  Plaintiff Jose Duran, in civil action No. 09-cv-4120, alleged that Bologna, in concert and conspiracy with officers under his command, provided a false affidavit of probable cause to justify a search of the store he owned and operated; destroyed and seized video surveillance equipment from his store without cause or justification; and caused Mr. Duran to be unlawfully arrested, detained, and prosecuted by providing knowingly false information.

e.  Plaintiff Emilio Vargas, in civil action No. 09-cv-5267, alleged that Bologna, acting in concert and conspiracy with officers he supervised,

disregarded proper police practices regarding the use of confidential informants in conducting an illegal search of the store Mr. Vargas managed; destroyed and seized video surveillance equipment from the store without cause or justification; and stole money and merchandise during the illegal search of the store.

f.  Plaintiff Robert Daly, Jr., in civil action No. 09-cv-6216, alleged that Bologna, with officers he was supervising, illegally seized his money and other property; used unreasonable force against him; and provided information from a confidential informant they knew to be false in order to justify the search and prosecution of Mr. Daly for narcotics offenses.

56.   Even before the PPD granted defendant Bologna a supervisory role in the narcotics unit, he was the subject of multiple excessive force civil rights lawsuits, including the following:

a.  Plaintiff Neftali Ramos Reyes, in civil action No. 05-2775, alleged that Bologna, along with his fellow officers, caused Mr. Reyes severe injuries by repeatedly kicking and beating him without legal cause during an arrest, resulting in a broken nose.

b.  Plaintiffs Brandon Banks and Brittany Albitz, in civil action No. 04-1052, alleged that Bologna, along with other defendant officers, punched Mr. Banks in the face, conducted an unjustified search of their home, brought a drug suspect into their home, and commenced a violent of interrogation of the suspect.

57.     Despite this history, the City failed for years to discipline Bologna. On the contrary, the PPD continuously promoted Bologna and allowed him to rise through the hierarchy of the PPD to the point that he held a position as a high-ranking staff inspector as of June 1, 2020.

58.     Based on his history of interactions with civilians in the performance of his police duties, policymakers for the City were aware of an obvious risk that Bologna would act in an unconstitutional manner and encourage officers under his supervision to do the same.

59.     The City enhanced that risk when, in the wake of George Floyd's murder and the massive demonstrations that followed, they authorized Bologna to command a unit of officers deployed on bicycles and assigned to monitor protest activity.

60.     These risks were realized throughout June 1, 2020, and June 2, 2020, when the largest demonstrations occurred.

61.     Only about an hour after assaulting and facilitating the arrest of Ms. Akins, defendant Bologna was filmed assaulting 21-year-old Evan Gorski, striking him hard in the head with a metal baton. Mr. Gorksi was injured severely enough to require hospitalization and stiches.

62.     Bologna and fellow officers then fabricated reports, erroneously stating that Mr. Gorski had assaulted a police officer. As a result, Mr. Gorski was arrested for aggravated assault and unlawfully detained for about 42 hours. The District Attorney's Office decline to bring charges after investigating and reviewing the false reports.[3]

---

[3] Mr. Gorski has brought litigation against, among others, the City of Philadelphia and Bologna. The litigation is now pending in this Court. *Gorski v. City of Philadelphia, et. al.,* No. 22-cv-0563-JHS.

63.     Video of Bologna's assault of Mr. Gorski was posted on Twitter by a user with the account name @Peopledelphia at 6:49 pm on June 1, just over an hour after the assault occurred.[4]

64.     In light of the video's posting, policymakers for the City knew that Bologna had acted unlawfully and caused serious harm while commanding a unit of officers at a political demonstration against police brutality.

65.     Notwithstanding that knowledge, they allowed Bologna to continue in these duties the next day, thereby ratifying and endorsing his previous unlawful conduct.

66.     On June 2, 2020, Bologna and his unit were operating in the area of 10th and Market Streets in Center City Philadelphia when Bologna encountered Caley Cohan. Bologna grabbed Ms. Cohan and threw her to the ground in response to her brushing her foot against the front tire of his bicycle, causing her injury.

67.     Bologna and fellow officers took Ms. Cohan into custody and, just as they had done the day before with Mr. Gorski, prepared reports falsely alleging that Cohan had assaulted them.  Ms. Cohan was detained for nearly 19 hours and charged with aggravated assault. Video of the encounter that was posted to social media showed that Ms. Cohan had committed no crime, but that, instead, Bologna had assaulted her. As a result of that video, the charges brought against Ms. Cohan were dismissed.[5]

68.     Based on social media postings concerning the assaults and false arrests of both Mr. Gorski and Ms. Cohan, the City was aware of a disturbing pattern of Bologna's violent and

---

[4] *See* https://twitter.com/Peopledelphia/status/1267588991655784448 (last accessed May 13, 2022).
[5] Ms. Cohan has also brought litigation against, among others, the City of Philadelphia and Bologna.  The litigation is now pending in this Court.  *Cohan v. Bologna*, No. 21-cv-4328-KSM.

unlawful conduct.  Despite that knowledge, the City took no action to immediately investigate or discipline Bologna.

69.     Bologna remained actively engaged in the policing of protest activities until three days later, on June 5, 2020, when the Philadelphia District Attorney's Office announced that it would bring criminal charges against Bologna for his assault of Mr. Gorski.

70.     The Philadelphia District Attorney's Office is still pursuing the charges against Bologna.

71.     Upon information and belief, the City of Philadelphia took no disciplinary action against Bologna, but, instead, allowed him to retire from his employment with the Philadelphia Police Department.

    ii.     **The City's History of Abusive Response to Peaceful Political Protest**

72.     The actions by defendant Bologna and defendant police officers John Does 1-5 on June 1, 2020 were the predictable result of the Philadelphia Police Department's long history of abusive responses to peaceful protest and protected First Amendment political expression.

73.     For many decades, Philadelphia police have systematically suppressed constitutionally protected political expression, especially that which concerns police brutality and the rights of Black Philadelphians.

74.     During the civil rights movement of the 1960s and 1970s, the PPD, then led by Commissioner Frank Rizzo, notorious for promoting violent and aggressive tactics, orchestrated raids against organizations striving for civil rights and racial equality, including the Philadelphia chapter of the Student Nonviolent Coordinating Committee (SNCC) and the Black Panther Party. The PPD also routinely suppressed peaceful civil rights demonstrations, including beating

Philadelphia high school students demonstrating for more Black teachers and inclusive

curriculum and NAACP-led protesters calling for the integration of Girard College.[6]

75.     These tactics have continued for decades. For example, in 2000, thousands of

Philadelphians gathered to peacefully protest the Republican National Convention. Philadelphia

police responded with widespread excessive force and unfounded, preemptive arrests, including

a raid on a West Philadelphia puppet-making warehouse where they arrested nearly 400 people.

Many of the arrestees were held in jail with very high bails for the duration of the convention to

prevent them from protesting. Nearly all the criminal charges against those arrested were

dismissed or ended in acquittals. Over the following several years, the City paid hundreds of

thousands of dollars to settle resulting civil rights lawsuits.[7]

76.     More recently, in the fall of 2011, Philadelphia police violently evicted Occupy

Philadelphia demonstrators from City Hall and conducted mass arrests of peaceful marchers who

were attempting to protest economic inequality. All arrestees were acquitted of their criminal

charges at trial and the City once again settled the resulting civil rights lawsuits for hundreds of

thousands of dollars.[8]

77.     Despite this history of unlawful and aggressive police responses to First

Amendment expression, the City has continued to acquiesce to unconstitutional police conduct

and resist accountability. As the use of smart phones to record police misconduct increased

---

[6] Timothy J. Lombardo, *Civil Rights and the Rise of Frank Rizzo in 1960s Philadelphia*, 18(2) PENNSYLVANIA LEGACIES 14-19 (2018).

[7] Francis X. Clines, *Many Charges Are Dismissed In G.O.P. Convention Protests,* THE NEW YORK TIMES (Dec. 10, 2000), *available at:* https://www.nytimes.com/2000/12/10/us/many-charges-are-dismissed-in-gop-convention-protests.html (last accessed May 17, 2022).

[8] Claudia Vargas, *City settles Occupy Phila. Suit for $200,000,* THE PHILADELPHIA INQUIRER (April 18, 2016), *available at:*
https://www.inquirer.com/philly/news/politics/20160419_City_settles_Occupy_Phila__suit_for_
_200_000.html (last accessed May 17, 2022).

rapidly through the 2010s, Philadelphia police routinely retaliated against civilians observing and recording public police activity. Despite City officials' awareness that police officers had arrested and brutalized people for the act of videorecording, they failed to correct this practice. In July 2017, after more than five years' worth of lawsuits challenging the arrest of people who were merely videorecording police action, the Third Circuit issued a precedential decision in *Fields v. City of Philadelphia,* finding that photographing, filming, or otherwise recording police while they conduct their official duties in public is protected by the First Amendment.

78.     The above-described incidents are only a small selection of available examples of the Philadelphia police's routine practice of using unlawful force and arrest powers against people exercising their First Amendment rights to demonstrate. Given this long and well-documented history, by June 1, 2020, the City's policymakers knew and understood that, if they did not intercede, Philadelphia police officers would continue to engage in such misconduct in the event of mass political protest.

### iii.     The City's Adoption of Plans for Aggressive Police Responses to the George Floyd Protests

79.     Before May 2020, the City had operational plans in place to respond to massive protests, should they occur. These plans included activating hundreds of police officers to engage in crowd control in a manner that minimally interfered with protester's rights to march and demonstrate.

80.     The PPD's Civil Affairs Unit was a key component of these plans. Officers in the Civil Affairs Unit receive specialized training on First Amendment rights and crowd-control tactics for large protests. The officers work in plain clothes and are taught not to appear threatening to people engaged in a protected political expression.

81.     Within days of the May 25, 2020, murder of George Floyd, City officials and PPD leadership were aware that the large demonstrations against police violence already emerging in Minneapolis and other American cities would begin in Philadelphia.

82.     Despite their knowledge and expectation that massive, widespread protests were set to take place in Philadelphia, by June 1, 2020, no one within the City leadership or PPD had implemented their existing operational plans to reduce risk to the public or demonstrators.

83.     On May 30, protests expanded across Center City and some people began to vandalize and steal from commercial businesses. As people took merchandise from stores, the City, already too late to preempt the vandalism, failed to implement a coordinated response plan. Many people were injured and numerous properties were damaged.

84.     The following day, May 31, Philadelphia Police Commissioner Danielle Outlaw publicly acknowledged that PPD did not implement a plan to respond to protests as quickly as she would have liked.

85.     In the afternoon and evening of May 31, PPD drove military-style armed vehicles into West Philadelphia. There, they fired tear gas at alleged "looters" along 52nd Street, as well as at peaceful protesters, bystanders, and residents watching from their homes. The officers, who were themselves protected from the tear gas by gas masks, face shields, and helmets, continued firing the chemical weapons throughout the residential neighborhood.

86.     This extreme use of force continued into June 1, when another unit of PPD officers dressed in tactical military gear fired more tear gas canisters at hundreds of peaceful demonstrators at dangerously close range on the Vine Street Expressway.[9]

---

[9] The violent police responses to demonstrations in West Philadelphia and on the Vine Street Expressway are the subject of multiple lawsuits currently pending in this Court. *See Smith et al. v. City of Philadelphia*, No. 20-cv-3431-JP; *Weltch et al. v. City of Philadelphia*, No. 20-cv-

87.     This misconduct resulted from the affirmative decisions by policymakers of the City of Philadelphia to break up demonstrations against police violence and to do so with the very types of brutality people had gathered to protest. These directives were communicated to officers throughout the PPD, including defendants Bologna and John Does 1-5, or at minimum, PPD officers were under the impression that there would be no consequences for the use of these violent and extreme tactics.

**E.     The Violations of Ms. Akins's Constitutional Rights and her Damages**

88.     There was no legal cause to justify the uses of force deployed against Ms. Akins on June 1, 2020.

89.     At the time defendant Bologna and defendant John Doe 2 tightened Ms. Akins's zip-ties to the point of causing nerve damage, she posed no threat to herself or the numerous armed officers surrounding her. At the time that defendant Bologna painfully twisted her fingers one-by-one, she was already restrained and handcuffed and was in no way resisting arrest or posing a threat of harm.

90.     At the time defendant Bologna and defendant John Doe 2 used unjustified force against Ms. Akins, defendants John Does 1, 3, 4, and 5, were aware of that unjustified use of force but failed to intervene to stop or prevent that use of force.

91.     At no time did Ms. Akins commit any offense in violation of the laws of the City of Philadelphia, the Commonwealth of Pennsylvania, or the United States, and there was no legal cause to justify her being stopped and detained.

---

3432-BMS; *Hough et al. v. City of Philadelphia*, No. 20-cv-3508-AB; *Zolitor v. City of Philadelphia*, No. 20-cv-3612-BMS.

92.     At the time that defendants used force against and unlawfully detained Ms. Akins, she was engaged in protected political speech, and the defendants used force against her and detained her in retaliation for her political speech.

93.     At all times relevant to this Complaint, the conduct of defendants Bologna and John Does 1-5 was willful, reckless, and in callous disregard of Ms. Akins's rights under federal and state law.

94.     Defendant Bologna, at all times relevant to this Complaint, was supervising and responsible for the actions of a unit of officers on bicycles, including defendant John Does 2-5, and was therefore liable for their unconstitutional and unlawful conduct and for failing to intervene to prevent their violation of Ms. Akins's constitutional rights.

95.     As a direct and proximate result of the conduct of defendants, Ms. Akins suffered and continue to suffer physical harm, emotional trauma, and loss of liberty.

## V.     CAUSES OF ACTION

### Count 1
### Plaintiff v. Defendants Bologna and John Does 1-5
### Unlawful Use of Force

96.     The actions of defendants Bologna and John Does 1-5 on June 1, 2020, violated Ms. Akins's right under the Fourth and Fourteenth Amendments to the United States Constitution to be free from the unreasonable use of force.

### Count 2
### Plaintiff v. Defendants Bologna and John Does 1-5
### Unlawful Arrest and Seizure

97.     The actions of defendants Bologna and John Does 1-5 on June 1, 2020, violated Ms. Akins's right under the Fourth and Fourteenth Amendments to the United States Constitution to be free from unlawful arrest and detention.

**Count 3**
**Plaintiff v. Defendants Bologna and John Does 1-5**
**Retaliation Against Protected Speech**

98.     On June 1, 2020, defendants Bologna and John Does 1-5 detained Ms. Akins and used force against her in retaliation for her engaging in protected political speech, and as such, violated Ms. Akins's right to freedom of speech under the First and Fourteenth Amendments to the United States Constitution.

**Count 4**
**Plaintiffs v. Defendant City of Philadelphia**
**Municipal Liability**

99.     The violations of Ms. Akins's constitutional rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution, Ms. Akins's damages, and the conduct of the individual defendants were directly and proximately caused by the actions and/or inactions of defendant City of Philadelphia, which encouraged, tolerated, ratified and was deliberately indifferent to the following policies, practices and customs and to the need for more or different training, supervision, investigation or discipline in the areas of:

      a.  The failure to discipline or properly monitor the actions of defendant Bologna given extensive information about his repeated violations of civilians' constitutional rights over a period of more than fifteen years and, further, the ratification of Bologna's misconduct in the wake of his unconstitutional conduct with respect to Ms. Akins;

      b.  The accepted practice of aggressive and abusive responses to peaceful political protest; and

21

c.   Improper planning of a police response to mass protests which

encouraged Philadelphia Police Department officers and supervisors to

approve and employ aggressive and violent tactics.

**Count 5**
**Plaintiff v. Defendants Bologna and John Does 1-5**
**States Law Claims**

100.   The actions of defendants Bologna and John Does 1-5 on June 1, 2020 constitute

the torts of assault, battery, conversion, and false arrest under the laws of the Commonwealth of

Pennsylvania.

## VI.   REQUESTED RELIEF

Wherefore, plaintiff Akins respectfully request:

A.      Compensatory damages as to all defendants;

B.      Punitive damages as to defendants Bologna and John Does 1-5;

C.      Reasonable attorneys' fees and costs as to all defendants;

D.      Such other and further relief as may appear just and appropriate.

Plaintiffs hereby demands a jury trial.

Respectfully submitted,

*/s/ Susan M. Lin*
Susan M. Lin
Attorney No. 94184

*/s/ Jonathan H. Feinberg*
Jonathan H. Feinberg
Attorney No. 88227

*/s/ Grace Harris*
Grace Harris
Attorney No. 328968

KAIRYS, RUDOVSKY, MESSING,
FEINBERG & LIN LLP
718 Arch Street, Suite 501S
Philadelphia, PA 19106
(215) 925-4400
slin@krlawphila.com
jfeinberg@krlawphila.com
gharris@krlawphila.com

*Counsel for Plaintiffs*